# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
**No. 23-272V**

| | | |
|---|---|---|
| STEELE CAMPBELL, Petitioner, v. SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent. | * | Chief Special Master Corcoran<br>Filed: August 17, 2026 |

*Christoper Williams,* Siri & Glimstad LLP, P.A., New York, NY, for Petitioner.

*Julianna Kober,* U.S. Department of Justice, Washington, DC, for Respondent.

## ENTITLEMENT DECISION[1]

On February 24, 2023, Steele Campbell filed a petition seeking compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Petitioner alleges that he suffered Transverse Myelitis ("TM") as a result of influenza ("flu") and/or tetanus, diphtheria, and acellular-pertussis ("Tdap") vaccines administered to him on August 29, 2021. Petition (ECF No. 1) at 1.

A two-day entitlement hearing was held in Washington, D.C., on September 8–9, 2025, and the parties subsequently filed post-hearing briefs. Petitioner's Post-Hearing Brief, dated Dec. 17, 2025 (ECF No. 52); Respondent's Post-Hearing Brief, dated Dec. 17, 2025 (ECF No. 53). Now, based upon my review of the record and consideration of the hearing testimony, I deny entitlement. The record does not preponderantly support the conclusion that Petitioner likely

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

experienced TM (and since *that* is the alleged injury, no causation theory relying upon it can succeed).

## I. Factual Summary

*Pre-Vaccination History*

Petitioner had a prior medical history significant for depression, hypertension, post-traumatic stress disorder, hypothyroidism, benign prostatic hyperplasia ("BPH"),[3] obstructive sleep apnea, vitamin D deficiency, transaminitis (abnormal liver function), thrombocytopenia (low platelet count), adiposopathy (abnormal fat accumulation in the body), numerous skin problems, plantar fasciitis of the left foot, left tympanic membrane defect and chronic otitis externa, right direct inguinal hernia with surgical repair in 2019, hyperlipidemia, right shoulder problems, and mild dysphagia. Ex. 1 at 1; *see also* Ex. 2 at 34–35, 181–82, 198–203, 212–13, 287–88, 366, 480; Ex. 6 at 15. He also had a pre-existing history of hypogonadism and was taking regular testosterone supplements. Ex. 6 at 15.

Petitioner's BPH and associated treatment has special relevance to the diagnosis issues in this case. While the pre-vaccination records filed in this case do not detail the scope or extent of treatment Petitioner was receiving for these issues, records that were filed in the case make numerous reference to such prior treatments and issues.

In addition, the medical records indicate that Petitioner experienced an incident leading to lower back pain in July 2021, although the parties dispute its significance. Petitioner reported developing acute onset lower back pain while kayaking in San Diego, to which he had to be towed back to the beach as a result. Ex. 2 at 366. He explained, however, that the lower back pain lasted only a couple of weeks before resolving spontaneously. *Id.*

*Vaccination and Urologic Concerns*

On August 29, 2021, Petitioner received the flu and Tdap vaccines at his local CVS Pharmacy in Gilbert, Arizona. Ex. 2 at 345; Ex. 5 at 3. In addition, he also received a second dose of Shingrix (varicella) vaccine. *Id.* Petitioner was fifty-seven years old at the time of vaccination. *Id.* There is no evidence in the record that Petitioner experienced any malaise-like reaction (fever, aches, soreness, etc.) to the receipt of these vaccines that would suggest the obvious presence of an inflammatory response.

---

[3] BPH is an "age-associated enlargement of the prostate resulting from proliferation of both glandular and stromal elements, beginning generally in the fifth decade of life; it may cause urethral compression and obstruction." *Benign Prostatic Hyperplasia*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=81505&searchterm=benign+prostatic+hyperplasia (last visited Aug. 17, 2026).

Petitioner's next medical treatment event post-vaccination occurred approximately one week later, when he saw his primary care provider ("PCP"), Michael Lucherini, M.D., of Summit Medicine & Pediatrics, on September 7, 2021, regarding his pre-vaccination BPH as well as unspecified "lower urinary tract symptoms." Ex. 2 at 347. This record does not provide further details of the nature of this medical visit.

Two days later, on September 9, 2021, Petitioner saw David Grossklaus, M.D., at Southwest Urologic Specialists Office ("Southwest Urologic"), with a chief complaint of urinary problems, including an increased frequency/urge to urinate at night. Ex. 6 at 14–16. The record of this visit confirms Petitioner's prior history of BPH, the fact that he had been receiving testosterone injections more frequently (from every four to every two weeks), and that he had "initially" tried Flomax[4] but "his symptoms got worse," so his medications had been changed to finasteride[5] and doxazosin.[6]

On exam, Dr. Grossklaus documented that Petitioner was able to move his four extremities without difficulty, and no focal neurologic deficits were observed. Ex. 6 at 14–15. He also noted Petitioner's existing medications, and the fact that "his symptoms appear to be getting worse," adding that a change in medications might be called for depending on results of a planned cystoscopy.[7] *Id.* at 15. Petitioner was diagnosed with lower urinary tract symptoms, nocturia, and testicular hypofunction. *Id.* at 15. Petitioner did not mention his recent vaccinations at this time (and a strong inference can be drawn from this record that the symptoms that prompted this medical encounter were associated with existing pre-vaccination issues).

Petitioner underwent the cystoscopy discussed with Dr. Grossklaus on September 14, 2021—the results of which revealed a mild lateral obstruction. Ex. 6 at 12. In addition, Petitioner saw Dr. Grossklaus again on October 18, 2021, for follow-up on his previous BPH treatment and other urologic complaints. *Id.* at 9–10. The cystoscopy was deemed to have yielded normal results, and Petitioner's testosterone replacement regime was noted, as well as possible changes to it. *Id.*

---

[4] Flomax (generic name Tamsulosin) is "an α1-adrenergic blocking agent specific for the receptors in the prostate; used to improve urine flow rate and reduce symptoms of benign prostatic hyperplasia." *Tamsulosin Hydrochloride*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=48805 (last visited Aug. 17, 2026).

[5] Finasteride is "an inhibitor of 5α-reductase, used in the treatment of benign prostatic hyperplasia …" *Finasteride*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=18659&searchterm=finasteride (last visited Aug. 17, 2026).

[6] Doxazosin Mesylate is "a quinazoline derivative that blocks α1-adrenergic receptors and has a longer half-life than that of prazosin; used in the treatment of hypertension and of benign prostatic hyperplasia." *Doxazosin Mesylate*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=14853&searchterm=doxazosin+mesylate (last visted Aug. 17, 2026).

[7] Cystoscopy is the "direct visual examination of the urinary tract with a cystoscope." *Cystoscopy*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=12347&searchterm=cystoscopy (last visited Aug. 17, 2026).

This document makes no reference to any other neurologic symptoms being experienced at that time.

*First Complaints of Peripheral Neurologic Symptoms*

The next medical record in this matter is from almost four weeks later—on November 11, 2021, when Petitioner returned to his PCP, Dr. Lucherini, reporting "a progression of significant numbness, tingling and pain in both legs, particularly in the right leg," that was "getting worse over the last 2–6 weeks." Ex. 2 at 404. (Such a timeframe would place onset of these symptoms as occurring no sooner than the start of October—more than one-month post-vaccination). He specifically complained of "a sensation of a 'pad' being at the bottom of the [right] foot, as though he [was] walking on some object." *Id.* Petitioner similarly reported an "unusual sensation" while urinating, as well as episodic lower back pain. *Id.* Dr. Lucherini proposed that Petitioner might be experiencing an advancing peripheral neuropathy and episodic right sciatica, with symptoms of pudendal neuropathy—which Dr. Lucherini deemed significant. *Id.* at 404, 406. Dr. Lucherini referred Petitioner to neurology for evaluation for progressive peripheral neuropathy. *Id.* at 351, 360.

That neurologic consult occurred on December 9, 2021, when Petitioner went to the Valley Institute of Neurology to see Arun Kumar, M.D. Ex. 2 at 366–68. Petitioner noted that "approximately [six] weeks ago, he developed sub acute [sic] onset tingling and numbness of the toes in the right foot." *Id.* at 366. (This would place onset even later—the end of October to early November). He reported experiencing similar symptoms, such as tingling and numbness, that gradually progressed to encompass the entire right foot over the course of one week, as well as a sensation in his right foot "as if he was walking on a crumpled sock…."—and further indicated feeling similar symptoms in his left toes and foot. *Id.* Petitioner also briefly recalled developing acute onset lower lumbosacral back pain while kayaking in San Diego in July 2021, but noted that the pain had resolved spontaneously shortly thereafter. *Id.* During the consultation, Petitioner acknowledged his "long standing" history of BPH, as well as his "pre-existing difficulty initiating micturition." *Id.*

Upon examination, Petitioner demonstrated an "absence of sensory symptoms in the hands, intact bilateral knee jerks and bilateral up going plantar [argued] against a progressive peripheral neuropathic process." Ex. 2 at 367. Dr. Kumar included in the initial differential diagnosis thoracic myelopathy, multiple sclerosis ("MS") of the spinal cord, and neuromyelitis optica spectrum disorder, but his favored explanation for the source of Petitioner's symptoms was an underlying demyelinating condition. *Id.* Petitioner was referred to Banner Baywood Medical Center Hospital for further evaluation due to the "progressive nature" of his condition. *Id.* at 367–68.

Petitioner next saw Brian Beck, M.D., at Gilbert Neurology on December 16, 2021. Ex. 2 at 374, 394; Ex. 9 at 55. He recounted the aforementioned medical history—reporting an initial onset of his symptoms beginning in October 2021, when he was selected for jury duty. *Id.*; *see*

*also* Ex. 1 at 2. Petitioner specifically recalled that when walking at that time, he had first experienced the sensation of "a wadded up ball of paper under his right foot, and right toes feeling numb and tingling," and a "[f]eeling as if a very cold limb was being rewarmed." Ex. 2 at 374. Shortly thereafter, he noted the same sensation moving to his left foot, and gradually progressing up towards his upper things, and eventually just above his hips with significant bowel and bladder incontinence issues. *Id.* Dr. Beck's primary diagnosis included hypoesthesia of the skin and unspecified abnormalities of gait and mobility. *Id.* at 374–75. He recommended that Petitioner undergo MRIs of the brain and cervical, thoracic, and lumbar spines urgently, although "thoracic and lumbar [MRIs] [we]re clear priorities." *Id.* at 374.

On December 28, 2021, Petitioner underwent a cervical spine MRI, and it revealed a congenital fusion at the C4–5 level (in the region of the neck) and degenerative spondylosis producing deformity of the ventral aspect of the cord and potential bilateral radiculopathy. Ex. 2 at 279, 298; Ex. 7 at 19; Ex. 12 at 19. He similarly underwent a brain MRI, the results of which were unremarkable. Ex. 7 at 27; Ex. 12 at 26. The next day, thoracic and lumbar spine MRIs were performed. *See* Ex. 2 at 388–90, 401–03; Ex. 7 at 8–12; Ex. 12 at 8–12 (documenting MRI of thoracic spine); *see also* Ex. 7 at 3–7; Ex. 12 at 3–7 (documenting MRI of lumbar spine). Now, imaging revealed multi-level degenerative disease as well as abnormal signal and enhancement, with expansion of the mid to lower spinal cord—findings consistent with a TM pattern. Ex. 7 at 12; *see also* Ex. 2 at 290, 403; Ex. 7 at 7, 12; Ex. 12 at 12. Of note, the thoracic spine MRI results specifically revealed "[m]oderate anterior wedge compression deformity of T7 vertebral body with about 50% loss of height anteriorly" and "[m]ild anterior wedge compression deformity of T8 vertebral body," which both appeared to be "chronic." Ex. 7 at 8. Such findings were deemed "seen in the setting of spinal cord infarct and clinical correlation [was] advised." *Id.*

*Hospitalization and Proposed TM Diagnosis*

As a result of his clinical presentation and findings, Petitioner was referred to the emergency room for further evaluation. Ex. 8 at 11. He was thereafter admitted to Chandler Regional Medical Center, where he remained hospitalized through January 3, 2022. *See generally* Ex. 8. During his hospitalization, Petitioner underwent repeat imaging of the thoracic spine, the results of which revealed expansion of the cord starting at T7/T8 extending down to T11/T12 with mild diffuse enhancement which was more prominent from T9 to T11/T12, all deemed consistent with longitudinally extensive TM ("LETM"). *Id.* at 9. He also underwent a lumbar puncture for cerebrospinal fluid testing, which revealed the presence of elevated protein levels (but with no evident record commentary on the significance of the findings—and thus whether they demonstrated the presence of inflammation). *Id.* at 3–5, 17.

Petitioner saw David Reynolds, D.O., for a neurology inpatient consultation, who concluded that there was "[f]airly good evidence to suggest [TM] as the diagnosis." Ex. 8 at 20. He was later examined by neurosurgeon, Tsinsue Chen, M.D., who similarly documented

Petitioner's presentation as more consistent with "a demyelinating process/[TM] vs. spinal cord stroke, [and] not consistent with mass/tumor." *Id.* at 22.

On January 2, 2022, Petitioner had a physical therapy ("PT") assessment conducted by Stephanie Cottingham, P.T. Ex. 8 at 466. At this time, Petitioner reported feeling less steady than normal, although it was noted that he was independent in all activities of daily living and was able to walk without an assisted device. *Id.* PT Cottingham noted that Petitioner appeared to be at a "baseline level for mobility" and "should be safe to discharge home," with no future plan for PT. *Id.*

Prior to his discharge, Petitioner again saw Dr. Reynolds. Ex. 8 at 36. Dr. Reynolds noted that Petitioner "had [vaccine] with TDAP and others planning overseas travel in [August] [that] m[ight] be associated uncertain however." *Id.* Petitioner was diagnosed with TM, leukocytosis, compression fracture of the T7 vertebra, hypertension, and hypothyroidism. *Id.* at 36. During his hospitalization, Petitioner received a temporary pheresis catheter placement, a lumbar puncture, plasmapheresis, and a round of high dose intravenous steroids for five days. *Id.* at 3–4, 8.

*Post-Hospitalization Treatment*

Petitioner returned to the Gilbert Neurology office on January 4, 2022, for a follow-up appointment with Dr. Beck, who diagnosed him with "acute [TM] in demyelinating disease of central nervous system." Ex. 9 at 53, 54. Petitioner reported the same symptoms as prior to hospitalization. *Id.* at 52. Following an examination, Dr. Beck's assessment was that Petitioner's TM was "potentially secondary to Tdap/flu vaccine approximately [two] weeks prior to onset of symptoms." *Id.* at 53.

Between February 4–6, 2022, Petitioner completed another three-day course of IV Solumedrol. Ex. 2 at 435. Later that month, Petitioner returned to Dr. Beck for another follow-up appointment at Gilbert Neurology. *Id.* at 436; Ex. 9 at 49. He reported feeling "minimal to no change after the steroid[s]" and that he was "unable to urinate when sitting, only with standing." Ex. 9 at 50. Petitioner underwent a repeat MRI of the thoracic spine, the results of which showed findings "consistent with [the] reported history of [TM]," with some improvement, including a decreased amount of abnormal enhancement with only "very mild enhancement of the thoracic cord" remaining. *Id.* The radiologist notes reiterated Petitioner's history of "[TM] from DTAP [sic] vaccine 8/2021." Ex. 2 at 438.

During a third follow-up appointment at Gilbert Neurology, Dr. Beck reviewed Petitioner's repeat imaging and noted that it was "consistent with [TM] versus other potential mimics such as [an] intramedullary mass." *Id.* at 442–43. It was further noted that Petitioner had tested negative for the Aquaporin-4 antibodies, thus making a diagnosis of Neuromyelitis Optica or Neuromyelitis Spectrum Disorder less likely (since those antibodies are considered biomarkers for those conditions). *Id.* at 442.

Petitioner was referred to Ajo Joy, M.D., a specialist in demyelinating disorders, at Gilbert Neurology, and the visit occurred on March 9, 2022. Ex. 9 at 43, 48. He reported that "in August he got a vaccination and in October he started noticing foot numbness." Ex. 2 at 445–46. Following physical and neurological examinations, Dr. Joy noted Petitioner's motor strength, reflexes, gait, and sensory response to light touch were all normal. *Id.*

On April 11, 2022, Petitioner had a follow-up appointment with Dr. Joy. Ex. 9 at 39. He continued to report a symptoms onset in October 2021 after receiving "[four] vaccinations at the same time including Tdap and flu," and that "[a]pproximately 10-14 days after vaccination he started developing symptoms which over time progressed." *Id.* He further reported experiencing "persistent numbness in his legs and feet with tingling and burning pain that he describe[d] as electric sensations." *Id.* Dr. Joy opined that Petitioner's condition was "most likely a [sic] isolated [TM] potentially postvaccination or viral related." *Id.* at 40.

On July 8, 2022, Petitioner returned to Southwest Urologic and reported urinary concerns, including "feelings of incomplete bladder emptying both in the morning and after sexual activity…." Ex. 6 at 6. Dr. Grossklaus attributed Petitioner's urinary problems to TM, noting that during this encounter they discussed "the effect [TM] can have on the bladder and incomplete bladder emptying…" *Id.* at 7.

Petitioner again returned to Southwest Urologic on August 22, 2022, for treatment of his ongoing BPH and lower urinary tract symptoms. *Id.* at 3. He complained of persistent urinary concerns and noted that he "travel[ed] frequently and [was] fearful of having retention occur when he [was] out of the country or on a cruise." *Id.* Petitioner was instructed to do intermittent catheterization. *Id.* at 4.

The following day (August 23, 2022), Petitioner presented to the MS clinic at Banner University Medical Center's ("BUMC") Neuroscience Institute for a second opinion. Ex. 2 at 472; Ex. 13 at 24. At this time, Petitioner saw neurologist Nida Laurin, M.D., and recounted the following medical history:

> At the end of August 2021 he had 4 vaccines: Shingles, influenza, hepatitis A, and Tdap. About 2-1/2 weeks later he started having 'peculiar' urinary symptoms for which he saw [a] urologist and had [a] uroscopy showing nothing of concern. His medications were adjusted, and he was better. Then, [ in the] beginning of October he started having [a] strange sensation in his right foot; it was getting gradually worse, numbness went up to his knees, his toes and feet felt like they had 'frostbit,' the bottom of the feet felt like he was 'walking on marbles.'"

Ex. 2 at 472; Ex. 13 at 24.

Following an examination, Dr. Laurin documented sensory loss in the lower extremities, gait and balance abnormalities, mild residual hip weakness, and positive Romberg sign[8], indicating a problem with balance. Ex. 2 at 473; Ex. 13 at 25. It was noted that "[Petitioner] developed symptoms consistent with [TM], and [a] thoracic MRI showed large expansile enhancing lesions from T7-T12" that "started after vaccination with multiple vaccines at once, and most likely [was] related to the vaccines." *Id.* Records indicate that Petitioner saw Dr. Laurin two more times on October 11, 2022, and January 17, 2023. Ex. 13 at 20.

Petitioner underwent another MRI of the thoracic spine on November 4, 2022, the results of which revealed persistent signal abnormality with mild cord expansion from T7-T11 that was unchanged from his February 23, 2022 MRI reports. There was, however, no longer any enhancement with contrast. Ex. 13 at 19.

Between January 5–8, 2023, Petitioner was hospitalized for a second time at BUMC, reporting a one-week history of worsening neuropathic pain and muscle cramps, worsening urinary retention, bowel incontinence, and a one-day history of acute back pain. Ex. 14 at 52. That day, a repeat MRI of the spine was conducted, revealing no abnormal signal changes in the thoracic spine. *Id.* at 54–55.

## II. Hearing Witnesses

### A. Petitioner's Witnesses

#### 1. *Steele Campbell*

Mr. Campbell was one of two fact witnesses to testify at the hearing. *See generally* Tr. at 5–33. He began his testimony describing his pre-vaccination health. *Id*. at 6. He testified that prior to his vaccination, he had no serious health problems and did not suffer from any chronic pain or numbness. *Id.* at 6. He was prescribed Flomax for treatment of an enlarged prostate in 2018 as part of preventative maintenance. *Id*. at 7.

Petitioner also noted one experience in July 2021 (less than two months prior to vaccination) bearing on the claim: when he went sea kayaking in San Diego. Tr. at 18. On this trip, when getting into a kayak, he felt something in his lower back and had difficulty paddling. *Id*. at 18–19. To treat the pain, Petitioner took ibuprofen and Tylenol and the pain resolved itself within 72 hours. *Id*. at 20–21. Petitioner testified that this pain was not similar to the pain he would later suffer after receiving his vaccine. *Id*. at 21.

---

[8] "Romberg sign" is defined as "swaying of the body or falling when standing with the feet close together and the eyes closed; the result of loss of joint position sense, seen in tabes dorsalis and other diseases affecting the posterior columns." *Romberg sign*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=106448&searchterm=Romberg+sign (last visited Aug. 17, 2026).

Petitioner recalled receiving the vaccines at issue on August 29, 2021. Tr. at 5. He first noticed his symptoms in the beginning of September 2021. *Id*. at 7. The first symptom he experienced was a strange feeling in his penis, but his symptoms continued to develop in October 2021. *Id*. at 7–8. This pain led Petitioner to seek treatment from a urologist, Dr. Grossklaus, on September 9, 2021, who agreed Petitioner was suffering from an enlarged prostate. *Id*. at 11–12; 17. Dr. Grossklaus scoped Petitioner's prostate and did not find the enlargement to be concerning, but recommended Petitioner continue with his medication for maintenance. *Id*. at 12.

On October 15, 2021, Petitioner felt a different strange sensation, while on jury duty, as if he had an extra sock in his right shoe. Tr. at 8. The following days, he continued to feel like he was stepping on something when walking, but also experienced tingling and hypersensitivity in his toes and the left ball of his feet. *Id*. at 9. He mentioned these symptoms over the phone to his doctor, and by the time he had an appointment, his treating doctor noted he was not suffering from a normal neuropathy. *Id*. at 9. Petitioner said he lost sensation between the top of his feet and his knees, but that the soles of his feet were hypersensitive with burning toes. *Id*. He also recalled that his right leg would sometimes jerk on its own and he would experience electrical shock-like feelings through his legs, and he later had difficulties urinating and defecating. *Id.* at 10.

After consulting with his primary care physician, Petitioner saw a neurologist, Dr. Kumar, who told him he was in a very serious situation. Tr. at 11. Because of concerns about the COVID-19 Pandemic at the time, Petitioner did not immediately check into a hospital despite Dr. Kumar's concerns. *Id*. Instead, Petitioner contacted Dr. Lucherini, who advocated for a second opinion and for Petitioner to receive MRIs before being admitted to a hospital. *Id*. Petitioner sought a second opinion from Dr. Beck, who theorized there might be something like a tumor on Petitioner's back. *Id.* Petitioner finally received multiple MRIs in December 2021. *Id.* at 12.

On December 28, 2021, Petitioner received a phone call from Dr. Lucherini, who urged him to go to the hospital that day out of fear Petitioner might become paralyzed. Tr. at 12–13. That evening, Petitioner went to Chandler Regional Hospital and received MRIs with contrast and a spinal tap. *Id*. at 13. The next day, Dr. Reynolds notified Petitioner that he had lesions on his spine which were interfering with his ability to do things. *Id.* at 14. Petitioner recalled being unable to urinate and defecate properly and having difficulty walking and with his balance. *Id.* Petitioner discussed his August 29, 2021 vaccinations with Dr. Reynolds, who at that point said Petitioner might have TM which attacked the myelin on his T7 to T12. *Id*. at 14. Petitioner's treatment plan was to receive plasmapheresis for five days and to be put on steroids. *Id*. at 14–15. He was subsequently discharged from the hospital, but his symptoms remained post-hospitalization. *Id.* at 15.

Petitioner testified he is still receiving monitoring and care for his ongoing symptoms. Tr. at 16. He uses a cane not because of leg weakness, but because he has difficulty controlling his

legs. *Id*. at 16–17. Petitioner continues to have trouble urinating and uses a catheter. *Id*. at 18. He explained that his condition has greatly affected his ability to engage in the activities he previously enjoyed as an active person, and he is unable to earn a living because of his pain and medication. *Id*. at 22. On cross examination, Petitioner admitted that he was taking Flomax and testosterone prior to his vaccination, and since 2018. *Id*. at 28. He also noted that his testosterone dosage was changed prior to his vaccination. *Id*. at 29. Petitioner has not undergone any additional testing for his diagnosis since 2023. *Id*. at 32–33.

2. *Laura Campbell*

Petitioner's wife was the second fact witness to testify. *See generally* Tr. at 34–47. She stated that before Petitioner's vaccinations, he was very active, exercising often and with no serious health problems. *Id.* at 5. Mrs. Campbell said that she first began to think something was seriously wrong with Petitioner after his consultation with Dr. Kumar (in December 2021) when it was recommended that he go to the emergency room. *Id.* at 37. Mrs. Campbell also testified that Petitioner's symptoms have not gone away since being discharged from Chandler Regional Hospital, with Petitioner telling her he is still experiencing numbness, electrical shocking pain, and difficulty balancing. *Id.* at 38.

Mrs. Campbell also testified about the July 2021 kayaking trip. Tr. at 39. She stated that she believed Petitioner must have just pulled a muscle while kayaking, and that he did not mention any numbness in his extremities or pain at that time. *Id.* at 39–40. Petitioner today is still suffering from extreme limitations to his mobility and is in constant pain with problems urinating and defecating. *Id.* at 40. She emphasized that his life has changed drastically because of his condition. *Id.* at 41.

On cross-examination, Mrs. Campbell deemed Petitioner's progression to be characterized as consistent/gradual. Tr. at 44. She could not recall exactly when Petitioner's incontinence and loss of bowel control became so severe as to warrant wearing adult diapers, but said he had lost control of his bowels many times during the night. *Id.* at 45. Mrs. Campbell was not aware of any urinary symptoms prior to September 2021. *Id.* at 46.

3. *Dr. Carlo Tornatore*

Dr. Tornatore, a neurologist, prepared two written reports and testified at trial on behalf of Petitioner. *See* Report, filed as Ex. 15 (ECF No. 26-1) ("First Tornatore Rep."); Report, filed as Ex. 53 (ECF No. 30-15) ("Second Tornatore Rep.").

Dr. Tornatore graduated from Cornell University with a Bachelor of Arts and Sciences in Neurobiology, and attended Georgetown University School of Medicine, where he received his

medical degree. Curriculum Vitae, filed as Ex. 54 (ECF No. 43-2) ("Tornatore CV") at 1. He subsequently completed an internship in Internal Medicine in the Department of Medicine at Providence Hospital, followed by a residency in Neurology in the Department of Neurology at Georgetown University Hospital. *Id.* at 2. Thereafter, he pursued a fellowship in Molecular Virology at the National Institute of Health in Bethesda, Maryland. *Id.* Dr. Tornatore currently serves as a Professor and Chairman of the Department of Neurology at Georgetown University of Medical Center, Chairman and Neurologist-in-Chief of the Department of Neurology at Medstar Georgetown University Hospital in Washington, D.C., and Medstar Health's regional Director of Neurology. *Id.* at 2–3. H has published extensively in the area of MS and other autoimmune disorders, as well as evaluated and treated individuals with various inflammatory conditions of the brain and spinal cord. First Tornatore Rep. at 2. Many of his patients have suffered from TM. Tr. at 53. However, very few seemed to have experienced an adverse immune response to some sort of agent or infection. *Id.* at 54.

Dr. Tornatore began his testimony by generally describing TM. Tr. at 54. He characterized it as an "umbrella term," used to describe any type of inflammation of the spinal cord. *Id.* at 54–55. (Indeed, and as evidence filed by Petitioner in this case establishes, the use of the term "TM" to diagnose myelopathies generally may be overbroad, with different etiologies possible - not all of which are likely autoimmune-mediated. *See, e.g.*, K. Blackburn & B. Greenberg, *Revisiting Transverse Myelitis: Moving Toward a New Nomenclature,* 11 Front. Neurol. 519468, 2-3 (2020), filed as Ex. 16 (ECF No. 26-2) ("Blackburn & Greenberg")). Dr. Tornatore deemed many of the symptoms experienced by Petitioner to be typical of TM, such as sensory symptoms, numbness, tingling, bladder and bowel symptoms, and motor symptoms. *Id.* at 60. Although monophasic, TM can have life-long residual sequelae, and treatment plans vary. *Id.* at 62–63.

To diagnose TM, a physician will look at a patient's history accompanied by a physical examination and imaging, such as an MRI, followed by a spinal tap to confirm central nervous system inflammation. Tr. at 55. These tests may be accompanied by bloodwork to determine the cause of the inflammation of the spinal cord. *Id.* at 55. Dr. Tornatore reiterated the criteria for diagnosing TM as the physical history of a patient, imaging, and then bloodwork. *Id.* at 57. He recognized that real-world presentations of TM may present differently from guidelines set forth by medical community **"**Working Groups," and that patients may still suffer from TM even if their testing results and presentation do not completely match the identified criteria. *Id.* at 57–58. G. Barnes et al., *Transverse Myelitis Consortium Working Group—Proposed Diagnostic Criteria and Nosology of Acute Transverse Myelitis*, 59 Neurology 499, 499 (2002), filed as Ex. A Tab 1 (ECF No. 28-2) (the "Working Group Criteria").

In Dr. Tornatore's view, the Tdap and flu vaccines have the potential to stimulate the immune system sufficient to cause TM. Tr. at 65. He proposed that the bladder issues experienced by Petitioner nine to ten days after his vaccination were related to Petitioner's TM. *Id.* at 66. The

visit with Dr. Grossklaus, at which time Petitioner's enlarged prostate was documented, did not provide evidence which would account for the sensory symptoms on the penis experienced by Petitioner. *Id.* at 67. Additionally, the abrupt change in the bladder symptoms Petitioner had been experiencing was unusual to Dr. Tornatore, given the length of time Petitioner had been on medication for their treatment. *Id.* at 68. Dr. Tornatore believed something happened in August 2021 that caused the abrupt change in bladder issues for Petitioner. *Id.* at 68–69. The only intervening medical event prior to the bladder issues manifesting in early September was Petitioner's vaccination in August. *Id.* at 69.

Dr. Tornatore then explained the neuroanatomical mechanism that he proposed could have resulted in Petitioner experiencing bladder issues followed by sensory issues in his feet. Tr. at 71–72. He posited that Petitioner's inflammation proceeded from the middle of the spinal cord toward the back, leading to the development of new and varied symptoms. *Id.* at 71–72. The front part of his spinal cord, which is responsible for motor systems, likely remained untouched, leading to no changes in Petitioner's muscle strength. *Id.* at 73. Dr. Tornatore was adamant that Petitioner's myelopathy was not vascular in nature, because the lack of motor deficiency findings by Petitioner's physicians were inconsistent with such a diagnosis. *Id.* at 73. And Petitioner's treating physicians all seemed to concur that something was occurring with Petitioner's spinal cord. *Id.* at 75.

Dr. Tornatore next assessed Petitioner's spinal imaging from December 29, 2021. Tr. at 75. The thoracic spine images showed diffuse abnormal increased T2 signal and enhancement with associated expansion of the mid to lower spinal cord extending from T7 and T8 to T12. *Id.* at 76. Dr. Tornatore interpreted this to mean that there was too much swelling in the area, corroborating the existence of an inflammatory process. *Id.* at 76. Additionally, there was evidence of lesion enhancement—demonstrating that the blood-brain/blood-spine barrier was inflamed enough to result in the MRI contrast dye leaking into the spinal cord. *Id.* at 76. This abrupt swelling and contrast enhancement of the spinal cord is not, Dr. Tornatore maintained, consistent with a vascular myelopathy. *Id.* at 77. And he disputed the significance of evidence of compression deformity at the T7 level, deeming it not likely caused by the July kayaking incident but instead the result of a chronic, distinguishable flattening unrelated to Petitioner's spinal cord inflammation. *Id.* at 78–79.

Dr. Tornatore also went through the commentary provided by other neurologists who observed the imaging of Petitioner's spinal cord and noted that these treaters all concluded that Petitioner was suffering from TM. Tr. at 79–80. A spinal tap subsequently administered to Petitioner also indicated inflammation of the spinal cord, despite the normal white blood cell range measured from the spinal fluid. *Id.* at 81. Dr. Tornatore maintained that CSF can be a helpful indicator when it is positive, but the evolution of inflammation seen in the MRI was more indicative of an inflammatory process. *Id.* at 82. When Petitioner was discharged, he was

diagnosed with TM and had other testing done to rule out alternate causes, such as B12 deficiency or lupus. *Id.* at 82. Additionally, Dr. Tornatore highlighted the treating neurologist's association of the condition with the vaccines received by Petitioner. *Id.* at 82–83. Dr. Beck, another neurologist, also made a connection between the vaccines and the TM. *Id.* at 83.

Throughout his testimony, Dr. Tornatore expressed the opinion that Petitioner's medical history was not consistent with a vascular myelopathy. Tr. at 86. The fact that Petitioner's spinal cord inflammation began to resolve slightly after treatment with steroids supported that conclusion. *Id.* at 86. Dr. Tornatore recounted the treating physicians who all believed Petitioner was suffering from acute transverse myelitis. *Id.* at 87–89. Dr. Tornatore concluded that the medical history, the pseudo-relapse suffered by Petitioner in January 2023, the course of the MRIs, and the treating physicians' opinions, all pointed to Petitioner's disease being inflammatory. *Id.* at 92–93.

Dr. Tornatore similarly testified that he did not believe Petitioner experienced any kind of myelopathy during his kayaking trip in July 2021. Tr. at 93. According to Dr. Tornatore, the pain experienced after kayaking was in the wrong location to be caused by the compression at T7. *Id.* at 94. Also, acute trauma to the thoracic body would likely prompt more intensive treatment than what Petitioner had required after the incident. *Id.* at 94. Instead, the vertebral compression evident from some of the imaging likely reflected a slow, parallel process that could be differentiated from Petitioner's later-observed TM. *Id.* at 95.

The ongoing symptoms experienced by Petitioner are also consistent with a patient suffering from TM. Tr. at 95–97. Petitioner's abrupt onset of bladder symptoms, and subsequent sensory symptoms over the course of the next few months, are consistent with an ongoing inflammation of the spinal cord that spreads from the middle of the cord to its posterior. *Id.* at 97.

Dr. Tornatore subsequently turned to his medical theory. Tr. at 103. To begin, he explained the concept of immune "self-tolerance," whereby due to some kind of dysfunction the immune system gains the ability to attack human tissue, leading to an inflammatory, damaging environment. *Id.* at 105–07. TM can have an infectious etiology, in which viruses or bacteria might infect the spinal cord, leading the immune system to try and eradicate them and causing inflammation. *Id.* at 107. However, Petitioner did not have any preceding infections before his TM. *Id.* at 108.

Dr. Tornatore then explained how the flu or Tdap vaccines could activate Petitioner's immune system in a manner akin to infection, invoking the process of molecular mimicry. Tr. at 109–10. The influenza wild virus, he noted, could cause TM itself, and this established an analogous process for vaccine causation. Receipt of the flu vaccine would lead to immune system stimulation, resulting in T cell activation and the seeking out of self-proteins that are similar to the

vaccine. *Id.* at 110. Dr. Tornatore then mentioned four case reports where the flu vaccine was shown to (albeit rarely, lead to LETM). *Id.* at 110–11; C. Wu et al., *Case Report: Hemorrhagic Longitudinally Extensive Transverse Myelitis*, 2016 Case Reps. in Neurological Medicine 1 (2016), filed as Ex. 24 (ECF No. 26-10). Although Petitioner's progression was slower than what had occurred in the case reports, Dr. Tornatore maintained that it is impossible to say "with any certainty that one phenotype of progression is going to be the same for everybody." *Id.* at 112. Dr. Tornatore also noted that a number of animal studies involving an experimental form of multiple sclerosis (which he deemed relevant to TM)[9] confirmed the pathogenic potential of the flu vaccine. *Id.* at 113–17; First Tornatore Rep. at 21–23. [10] In sum, receipt of a flu vaccine can in rare cases cause the production of immune cells capable of cross-reacting with portions of the myelin basic protein ("MBT") in the central nervous system nerves, leading to autoreactive inflammation in the spinal cord. *Id.* at 115–16.

Dr. Tornatore also proposed that he could demonstrate a specific, amino acid-sequential homology between MBP peptides and those found in influenza A—specifically the HA protein. Tr. at 118. Direct "immunization" in an animal study of the HA protein had, he contended, been shown to result in an experimental form of CNS myelitis. *Id.* at 119. But there did not have to be complete homology between the peptide and the MBT—anything close enough could trigger the T-cells into action (a concept called T-cell degeneracy). *Id.* at 121. Here, Petitioner received the flu vaccine, which contained antigens recognized by Petitioner's immune system. *Id.* at 122. Some of the T cells that were activated were actually T cells against MBP, with expansion of the cross-reactive attack due to T cell degeneracy. *Id.* at 122. These T cells then targeted the spinal cord and caused the inflammation leading to TM. *Id.* at 122.

Dr. Tornatore proposed the same mechanism for how the Tdap vaccine could provoke TM. Tr. at 123. There is demonstrated potential for cross reaction between the tetanus toxoid antigens and the T cell receptors that recognize MBP, due to mimicry, which he supported through six case reports in which the tetanus toxoid had been shown to stimulate specific T cells, causing them to be misdirected into self-attack. *Id.* (citations omitted). Dr. Tornatore identified a sequence in tetanus toxoid that has sequence homology with MBP, with the sequence being found on the extracellular domain and thus was easily identifiable by the immune system. *Id.* at 124. This sequence can stimulate the immune system and cause the development of antibodies which could lead to MBP injury. *Id.* at 125.

---

[9] EAE is an animal model study allowing researchers to explore immune function in the context of an MS-like central nervous system autoimmune disease. *See Harrington v. Sec'y of Health & Hum. Servs.*, No. 14-43V, 2018 WL 4401976 (Fed. Cl. Spec. Mstr. Aug. 14, 2018).

[10] The items of literature Dr. Tornatore discussed in this portion of his testimony, and referenced in his primary report, are regularly referenced in Program cases (especially when Dr. Tornatore serves as expert). *See Peterson v. Sec'y of Health & Hum. Servs.*, No. 22-322V, 2025 WL 3269458 (Fed. Cl. Spec. Mstr. Oct. 30, 2025).

Dr. Tornatore concluded his testimony by summarizing how Petitioner's TM fits within his medical theory. Tr. at 128. Petitioner received the vaccines, which stimulated his immune system, his T cells were misdirected toward the spinal cord, and he developed TM. *Id*. Petitioner's eleven-day development period from vaccination to first symptoms (his urologic complaints in September 2021) was consistent with this theory, because within one to two weeks after a vaccine an immune response can enter the tissue. *Id.* at 129. Dr. Tornatore disputed the contention that Petitioner's overall progression did not fit into the 21-day course to nadir, as set forth in the Working Group Criteria. *Id.* at 130. In fact, inflammatory myelitis can extend beyond 21 days and become more chronic. *Id.* at 131; O. Murphy et al., *Identification of Specific Causes of Myelopathy in a Large Cohort of Patients Initially Diagnosed with Transverse Myelitis,* 442 J. Neurol. Sci. 120435 (2022), filed as Ex. C Tab 1 ("Murphy").[11]

Murphy is a retrospective study in which the Johns Hopkins Myelitis and Myelopathy Center considered the "final etiologic diagnosis" out of a sample of nearly 1200 patients diagnosed with TM, and over a 25-year period, determining that in many cases (as etiologic understanding of the nature of a particular patient's myelopathy evolved) physicians made ineffective or mistaken treatment decisions based on an early mischaracterization of the cause of the myelopathy in question. Murphy at 1. The majority of studied patients had experienced an inflammatory form of myelopathy (although many of that group had experienced TM as a component of some other condition, like MS), but 12 percent were ultimately deemed to have experienced idiopathic TM. *Id.* at 2. Meaningful percentages of patients who had experienced inflammatory-caused forms of myelopathy experienced a "chronic" progression (meaning a timeframe to nadir exceeding 21 days)—although a *greater* percentage of *non-inflammatory* myelopathies exceeded the 21-day timeframe from the Working Group) *Id.* at 3 Table 1 (32 percent of inflammatory myelopathies versus 43 percent of non-inflammatory). And Murphy's authors otherwise seem to consider longer progression timeframes not properly associated with immune-mediated forms of myelopathy. *Id.* at 6 (noting "spinal cord infarction should be considered in the differential of any hyperacute myelopathic syndrome, while disorders in which a chronic presentation is likely include sarcoidosis-associated myelopathy, rheumatologic myelopathy, structural myelopathies, and AVM/AVF").

[11] Murphy stands as an example of the kind of "hidden" items of literature often filed in Program cases, and the difficulties special masters have in ensuring a complete review of the record has occurred. Counsel for the Petitioner did not clearly identify this item of literature when Dr. Tornatore referenced it at trial. More so, Dr. Tornatore referenced it variously as "Coleman" in his testimony, and then it is cited in his expert report as authored by "Olwen"—the first name of the principal author. *See* Second Tornatore Rep. at 2–3, 10. Dr. Tornatore's second report also erroneously identifies "Olwen" as having been published in 2018. *Id.* at 3. None of these errors were resolved by Petitioner at any time in the case's progression, and they could have misled me into ignoring the article completely, given the veritable ocean of filed items of literature. Yet claimants repeatedly exhume such articles when seeking review of a special master's determination, holding them out as vital items of proof that were carelessly disregarded by the special master in deciding the case.

Thus, while it may be *possible* that some immune-mediated myelitis cases become chronic, more often than not they do not. But Dr. Tornatore nevertheless stressed the possibility of inflammatory myelopathies exceeding 21 days in progression, comparable to what Mr. Campbell appeared to have experienced. Second Tornatore Rep. at 3 (18 percent of studied idiopathic cases in Murphy (27 out of 149)). This percentage is still less than the percentage of non-inflammatory instances, but Dr. Tornatore maintained it was still possible, adding that "[t]hese are artificial times, timelines . . . [t]he *majority may fit within that window,* but there are always going to be some that are going to fall outside that window." Tr. at 131 (emphasis added).

On cross-examination, Dr. Tornatore maintained that diagnostic elements established by the Working Group Criteria may stand as reasonable guidelines for diagnosis, but they are not strict and need to be assessed holistically in any particular patient. Tr. at 138. The symptoms often relied on to diagnose someone with TM are symptoms referable to the spinal cord, such as sensory symptoms, imaging consistent with TM, and markers in a spinal tap. *Id.* at 139–40. Petitioner did not have progressive disease—for if he had, every modality in the spinal cord would be getting worse, including motor. *Id.* at 145–46. But Petitioner never developed weakness, cutting against the contention that his course was due to some structural/vertebral issue. *Id.* at 144–45.

Dr. Tornatore emphasized that although there is no evidence as to whether a live virus vaccine poses a higher risk than one containing only killed viral/bacterial particles, the risk of receiving a dead virus vaccine is not negated. Tr. at 151. He denied as well that Petitioner's symptoms were attributable to a compressive etiology. *Id.* at 155. He conceded, however, that whether Petitioner had a genetic predisposition (so as to align Petitioner's case with some of the literature) was speculative. *Id.* at 164, 166. And he maintained that a chronic/progressive form of myelopathy would require both imaging evidence to confirm chronicity in lesions as well as clinical proof of weakness and worsening over time. *Id.* at 191.

In a rebuttal appearance on the stand, Dr. Tornatore reemphasized Petitioner's clinical course as consistent with TM, invoking his own experience treating patients. Tr. at 319. He maintained that he has seen many patients who do not fit the standardized timeframe, and that its course can exceed 21 days in progression to nadir. *Id.* at 320, 322. He also testified that lower extremity weakness is not a necessary symptom required to diagnose TM. *Id.* at 323. He questioned Respondent's speculation that Petitioner had possibly experienced a cavernoma,[12] maintaining that it would have appeared on the multiple MRIs undergone by Petitioner had one existed. *Id.* at 329. Dr. Tornatore was also confident that one of the treating physicians would have treated a vascular malformation if it had been present. *Id.* at 331. And Petitioner should have gotten acutely worse

[12] A cavernoma is a rare cluster of abnormal, thin-walled blood vessels located inside or near the spinal cord. These slow-flow lesions look like small raspberries and can leak or bleed, pressing on tight nerve bundles which leads to pain, numbness, muscle weakness, or trouble with bladder and bowel control. *Cavernous Hemangioma*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=80327 (last visited Aug. 17, 2026).

when he received steroids for treatment if he had a vascular malformation—but he did not. *Id.* at 333.

B. *Respondent's Witness – Dr. Karen Roos*

Dr. Roos prepared two written reports for Respondent, relying on her expertise as a neurologist. Report, dated Sept. 20, 2024, filed as Ex. A (ECF No. 28-1) ("First Roos Rep."); Report, dated Feb. 7, 2025, filed as Ex. C (ECF No. 33-1).

Dr. Roos is a board-certified neurologist specializing in infectious diseases and serves as the John and Nancy Nelson Professor Emerita of Neurology at the Indiana University School of Medicine, where she has taught neurology since 1985. Curriculum Vitae, filed as Ex. B (ECF No. 28-6) ("Roos CV") at 1, 2. She obtained her undergraduate degree from the University of Pittsburgh, and her medical degree from the Drexel University School of Medicine. *Id.* at 1. Thereafter, she completed her residency in Neurology and training in Electroencephalography at the University of Virginia Medical Center. *Id.* Dr. Roos has over 40 years of experience in treating patients with neurological disorders with a specialization in neurological infectious diseases. First Roos Rep. at 1. She has authored or edited eight textbooks and has published over 255 manuscripts relating to neurology. *Id.* On multiple occasions, Dr. Roos has treated and cared for patients with TM and infectious/parainfectious myelitis.

Dr. Roos began her testimony by explaining the difference between myelopathy and myelitis. Tr. at 209. She maintained that the medical field is moving away from "TM," and myelitis more specifically, as diagnostic terms, and instead dividing myelopathies into inflammatory versus noninflammatory myelopathies. *Id.* at 209. The former would include autoimmune myelopathies, while that latter would reflect structural diseases of the spine itself. *Id.* at 209–10. Dr. Roos emphasized that in her experience, TM will involve weakness, and often presents with multiple autonomic symptoms beyond the bladder. *Id.* at 212. Causes of TM may be infections, autoimmune disorders, and demyelinating diseases like MS. *Id.* at 214.

In supporting her opinion as to diagnosis, Dr. Roos referenced the diagnostic guidelines established by the Working Group Criteria. She noted that this article was produced by a group of eminent medical and scientific professionals – including herself. Tr. at 215; Working Group Criteria at 505 (listing Dr. Roos as one of 18 co-authors).[13] Dr. Roos allowed that the Working Group Criteria were in part aimed at standardizing the TM diagnosis for consistency in research and studies, and that it did not set a care standard, but she still deemed the criteria highly useful in guiding treater practice. *Id.* at 273–74. She herself has relied on the criteria for diagnosis of acute

[13] Dr. Tornatore suggested in his testimony that he had been asked to be a member of this group as well—something Dr. Roos disputed. Tr. at 214. Whether or not Dr. Tornatore's recollection is correct, Dr. Tornatore is not listed as a co-author of the Working Group Criteria.

TM. *Id.* at 281. She also agreed that "vaccination history" was identified in the Working Group Criteria as a factor to be evaluated, but deemed it to reflect the Working Group's awareness of TM developing after receiving specific vaccines (rabies and smallpox) having no relevance to this case. *Id.* at 281; Working Group Criteria at 503 Fig. 1.

The Working Group Criteria, Dr. Roos noted, include the development of sensory, motor, or autonomic dysfunction (although the latter is not always present) as supportive of a TM diagnosis. Tr. at 215–16. Dr. Roos particularly highlighted the importance of progression to nadir in TM as a diagnostic factor, observing that in the majority of cases progression should occur between four hours and twenty-one days. *Id.* at 216. Over such a timeframe, a patient will reach their maximum deficit with their motor weakness getting worse, while other clinical symptoms (such as dysautonomia) accumulate. *Id.* at 217–18. Patients suffering from TM will thus usually display progressive neurological deficits developing and getting worse in a relatively-brief timeframe; they do not have a pause in development for six weeks followed by a new symptom (akin to what Petitioner experienced). *Id.* at 219.

A TM diagnosis also requires exclusion of evidence of an extra-axial compressive etiology. Tr. at 215–16, 220. But Petitioner's December 2021 imaging had revealed compression fractures at T7 and T8 levels, which Dr. Roos considered uncommon. *Id.* at 220. Petitioner's history had been consistent with an ascending sensory peripheral neuropathy (and in fact as of November 2021 treaters like Dr. Lucherini had so speculated). Tr. at 221. But the MRI identifying swelling of the spinal cord, along with the compressive evidence, suggested to Dr. Roos that Petitioner was suffering from a vascular myelopathy attributable to the structural event reflected in the compression fractures. *Id.* at 221–23.

It was also possible, in Dr. Roos's experience, for a patient to be misdiagnosed with TM as it is classically understood. Tr. at 227. The prevailing shift in medicine in differentiating inflammatory from noninflammatory myelopathies in part helped to prevent patients from being anchored to an incorrect TM diagnosis. *Id.* at 234. To identify the precise type of myelopathy a patient may have, it was important to take into account the patient's overall course. *Id.* at 236. The failure of immune-based therapies (not leading to a patient's improvement) would also be evidence that an inflammatory myelitis was not the correct diagnosis. *Id.* at 228. And imaging was important—and in some cases a spinal angiogram should be performed to rule out vascular/ischemic explanations. *Id.* at 229. But that had not been done for Petitioner, which Dr. Roos deemed a treatment error. *Id.* at 230.[14]

[14] Dr. Roos also speculated that Petitioner might have suffered from a spinal cavernoma. Tr. at 240. Spinal cavernomas are only identifiable by angiography and can cause fluctuating symptoms in patients. *Id.* However, I ultimately find the record is inconclusive on this potential alternative etiology (and as noted below, I am unable to deem any alternative diagnosis to have preponderant weight—although I do conclude that an inflammatory form of TM is *itself* not preponderantly established.

Dr. Roos disputed TM as a proper diagnosis for Petitioner. TM is progressive, but Petitioner's symptoms and clinical course was inconsistent with that understanding. Tr. at 211. Instead, Petitioner more likely had a noninflammatory myelopathy. *Id.* at 211–12.

In support, Dr. Roos referenced the medical records filed in this case. Tr. at 241. Pre-vaccination, Petitioner had been experiencing benign prostate enlargement for which he received several medications; hypertension; a history of alcohol abuse; hypothyroidism; lumbar degenerative disc disease; and hypogonadism. *Id.* at 242–43. Given Petitioner's pre-vaccination BPH history, Dr. Roos denied that his bladder symptoms reflected onset of TM. *Id.* at 244. Although the symptoms Petitioner reported in September 2021 could reflect "neurogenic bladder" consistent with TM's onset, they would usually be followed by a brisk progression to other neurologic symptoms, which had not occurred in this case. *Id.* at 316. Dr. Roos also highlighted the lack of evidence of motor weakness, deeming its absence inconsistent with TM, which in her experience would not involve only sensory symptoms. *Id.* at 245, 283.

In addition, Dr. Roos maintained that neuroinflammatory TM would not feature a temporal pause between manifestation of bladder symptoms and the sensory symptoms that Petitioner had testified began six weeks later, in mid-October 2021. Tr. at 244. This intermittent course was, in Dr. Roos's view, more consistent with a vascular myelopathy. *Id.* Dr. Roos more generally maintained that Petitioner was likely suffering from something chronic, given his overall course and nature of symptoms presentation. *Id.* at 242–43.

Dr. Roos further highlighted the course of symptoms Petitioner began displaying in December 2021, and what treaters then discovered through their evaluations and testing. Tr. at 248. The imaging done at that time revealed structural abnormalities in the spine. *Id.* at 251. Dr. Roos felt strongly that Petitioner's structural abnormalities at T7 and T8 were not merely coincidental, but significant to Petitioner's condition. *Id.* at 255.[15] Additionally, Petitioner's lack of improvement while on plasmapheresis and steroids was relevant, and inconsistent with a myelitis form of TM. *Id.* at 256. (Indeed, his worsened reaction to steroids was supportive of a vascular explanation for the symptoms. *Id.* at 301). If Petitioner had TM, he also would have later displayed weakness with his sensory level reported on March 9, 2022. *Id.* at 257.

Dr. Roos emphasized that a neurological disorder is defined by the clinical presentation and the clinical course. Tr. at 260. The medical record was inconsistent with TM's usual clinical course, calling into question the diagnosis overall. *Id.* at 260–61. She was most concerned about the lack of consistent progression and the lack of motor symptoms, two characteristics she was

[15] When questioned about the kayaking incident in July 2021, Dr. Roos speculated that Petitioner could have at that time experienced the compression fracture in T7 and T8 with contusion of the spine that was later seen on imaging, noting that it was consistent with Petitioner's sensation (as he testified) that his pain radiated down his back all the way to the lumbosacral portion of the spine. Tr. at 291–92. She also referenced Petitioner's exercise habits, and their potential to have caused him an injury, despite the record lacking substantiation for this opinion. *Id.* at 292.

adamant are always present in cases of TM, with lower extremity weakness especially characteristic of inflammatory spinal cord myelitis. *Id.* at 307, 308. Rather, in Dr. Roos's view Petitioner's treating neurologists had simply "anchored" him throughout his treatment to the wrong diagnosis. *Id.* at 269. When Petitioner presented in January of 2023 with worsening symptoms, his treating physicians should have considered an alternative diagnosis. *Id.* at 310.

In highlighting the absence of motor weakness as undermining the proposed TM diagnosis, Dr. Roos noted that such a presentation *was* consistent with a vascular spinal cord injury. A vascular etiology would typically spare the lateral corticospinal tracts, resulting in isolated sensory symptoms but no motor symptoms. Tr. at 313–14. Additionally, patients with vascular malformations will often get better, but go on to experience recurrent symptoms. *Id.* at 317. This was consistent with Petitioner's records of symptoms and treatment. *Id.*

## III. Procedural History

The matter was initiated approximately three years ago. After the case's activation, Respondent filed his Rule 4(c) Report in December 2023, opposing entitlement. Respondent's Report, dated Dec. 15, 2023 (ECF No. 22). The parties thereafter began the process of filing expert reports, and that process was completed in February 2025, and the matter was subsequently set for hearing. The trial occurred as scheduled in September 2025, and post-trial briefing was concluded by the end of that year.

## IV. Applicable Legal Standards

### A. *Petitioner's Overall Burden in Vaccine Program Cases*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that he suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table—corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that his illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).[16] There is no Table claim for TM resulting from any covered vaccine (although claims alleging TM as a vaccine injury are quite common in the Program).

---

[16] Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. App'x. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs*., 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a Non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen v. Sec'y of Health and Hum. Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005): "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury."

Each *Althen* prong requires a different showing. Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355–56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 549.

Petitioners may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1378–79 (Fed. Cir. 2009) (citing *Capizzano*, 440 F.3d at 1325–26). Special masters, despite their expertise, are not empowered by statute to conclusively resolve what are essentially thorny scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380. Accordingly, special masters must take care not to increase the burden placed on petitioners in offering a scientific theory linking vaccine to injury.

In discussing the evidentiary standard applicable to the first *Althen* prong, the Federal Circuit has consistently rejected the contention that it can be satisfied merely by establishing the proposed causal theory's scientific or medical *plausibility*. *See Cerrone v. Sec'y of Health & Hum. Servs.*, 146 F.4th 1113, 1121 (Fed. Cir. 2025) (argument that prong one requires only a showing of plausibility "understates the burden [a petitioner] bears under the first factor in the *Althen* formulation"); *Kalajdzic v. Sec'y of Health & Hum. Servs.*, No. 2023-1321, 2024 WL 3064398, at *2 (Fed. Cir. June 20, 2024) (arguments "for a less than preponderance standard" deemed "plainly inconsistent with our precedent" (*citing Moberly*, 592 F.3d at 1322)); *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019); *see also Howard v. Sec'y of Health & Hum. Servs*., 2023 WL 4117370, at *4 (Fed. Cl. May 18, 2023) ("[t]he standard has been preponderance for nearly four decades"), *aff'd*, 2024 WL 2873301 (Fed. Cir. June 7, 2024) (unpublished). And petitioners always have the ultimate burden of establishing their *overall* Vaccine Act claim with preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted); *Tarsell v. United States*, 133 Fed. Cl. 782, 793 (2017) (noting that *Moberly* "addresses the petitioner's overall burden of proving causation-in-fact under the Vaccine Act" by a preponderance standard).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375–77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). In establishing that a vaccine "did cause" injury, the opinions and views of the injured party's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence, since they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Medical records and statements of a treating physician, however, do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. Section 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs*., 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted"). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should be weighed against other, contrary evidence also present in the record—including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011) (not arbitrary or capricious

for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Veryzer v. Sec'y of Dept. of Health & Hum. Servs.*, No. 06-522V, 2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 F. Appx. 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must align with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. den'd after remand*, 105 Fed. Cl. 353 (2012), *aff'd mem.*, 503 F. Appx. 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. den'd* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

B. *Legal Standards Governing Factual Determinations*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11(c)(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (determining that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

As noted by the Federal Circuit, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras*, 993 F.2d at 1528; *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd*, *Rickett v. Sec'y of Health & Hum. Servs.*, 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). A series of linked

propositions explains why such records deserve some weight: (i) sick people visit medical professionals; (ii) sick people attempt to honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Hum. Servs.*, 26 Cl. Ct. 537, 543 (1992), *aff'd*, 993 F.2d at 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs*., No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs*., 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, the Federal Circuit has also noted that there is no formal "presumption" that records are accurate or superior on their face to other forms of evidence. *Kirby v. Sec'y of Health & Hum. Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021). There are certainly situations in which compelling oral or written testimony (provided in the form of an affidavit or declaration) may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs*., 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs*., No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later

testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs*., 110 Fed. Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

C. *Analysis of Expert Testimony*

Establishing a sound and reliable medical theory often requires a petitioner to present expert testimony in support of his claim. *Lampe v. Sec'y of Health & Hum. Servs*., 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594–96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999). Under *Daubert*, the factors for analyzing the reliability of testimony are:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

In the Vaccine Program the *Daubert* factors play a slightly different role than they do when applied in other federal judicial settings, like the district courts. Typically, *Daubert* factors are employed by judges (in the performance of their evidentiary gatekeeper roles) to exclude evidence that is unreliable or could confuse a jury. By contrast, in Vaccine Program cases these factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs*., 94 Fed. Cl. 53, 66–67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). The flexible use of the *Daubert* factors to evaluate the persuasiveness and reliability of expert testimony has routinely been upheld. *See, e.g.*, *Snyder*, 88 Fed. Cl. at 742–45. In this matter (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold, to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

Respondent frequently offers one or more experts in order to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs*., 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 146 (1997)); *see also Isaac v. Sec'y of Health & Hum. Servs*., No. 08–601V, 2012 WL 3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for review den'd*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. App'x. 999 (Fed. Cir. 2013) (citing *Cedillo*, 617 F.3d at 1339). Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly*, 592 F.3d at 1325–26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs*., 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

D. *Consideration of Medical Literature*

Both parties filed medical and scientific literature in this case, but not all such items factor into the outcome of this decision. While I have reviewed all the medical literature submitted, I discuss only those articles that are most relevant to my determination and/or are central to Petitioner's case—just as I have not exhaustively discussed every individual medical record filed. *Moriarty v. Sec'y of Health & Hum. Servs.*, No. 2015–5072, 2016 WL 1358616, at *5 (Fed. Cir. Apr. 6, 2016) ("[w]e generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.,* 527 F. App'x 875, 884 (Fed. Cir. 2013) ("[f]inding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered").

**ANALYSIS**

**I. Treatment of Transverse Myelitis in the Vaccine Program**

Although the parties disagree as to Petitioner's proper diagnosis (as well as the emphasis that should be given to some of the relevant medical criteria), they both offered reliable evidence that help delineate and distinguish the competing etiologic explanations in this case. TM is defined by the Working Group Criteria as a myelitis[17] attacking the spine, and "characterized clinically by

[17] "Myelitis" is defined as "1. Inflammation of the spinal cord, often part of a more specifically defined disease process. One group of diseases is named according to whether primarily white matter or gray matter is affected (leukomyelitis

acutely or subacutely developing symptoms and signs of neurologic dysfunction in motor, sensory, and autonomic nerves and nerve tracts of the spinal cord. There is often a clearly defined rostral border of sensory dysfunction, and spinal MRI and lumbar puncture often show evidence of acute inflammation." Working Group Criteria at 499.

There is growing support for the idea that TM may have an overbroad quality as a diagnostic classification. Blackburn & Greenberg at 3 ("it is time to retire the term [TM] and overhaul current classification symptoms to cultivate modern, coherent definitions for myelitis"); *Henningsen v. Sec'y of Health & Hum. Servs.*, No. 21-1101V, 2026 WL 1649737, at *32 (Fed. Cl. Spec. Mstr. May 8, 2026) (petitioner did not preponderantly establish her alleged TM diagnosis), *mot. for review filed* (Fed. Cl. June 8, 2026). For example, the orientation of a lesion—lateral (up and down) or transverse (across)—is not a factor that excludes TM as a diagnosis, even though the effect of the lesion's positioning can be relevant to both diagnosis and treatment (and the very term "*transverse* myelitis" incorrectly implies only lesions horizontal to the spinal cord as included). In addition, evidence of spinal cord inflammation sufficient to meet the diagnostic definition of TM can often be a precursor for some other larger conditions, like MS—even though it would not thereafter be proper to say an affected individual could be diagnosed with a single acute TM occurrence (and in fact these other kinds of diagnoses are *exclusion factors* for a TM diagnosis). Working Group Criteria at 500 Table 1.

More importantly (and as the Working Group Criteria recognize), spinal cord injuries that *appear* to be neuroinflammatory in origin can have different etiologies. Blackburn & Greenberg at 2 Fig. 1. For example, extremely rapid onset (i.e. within hours) is often considered to be evidence of ischemia/infarct. Working Group Criteria at 501; *see also Kouchak v. Sec'y of Health & Hum. Servs.*, No. 18-1279V, 2023 WL 6973017, at *5 (Fed. Cl. Spec. Mstr. Sept. 26, 2023) (noting acute/sudden manifestation of symptoms as more common to infarct than with TM). By contrast, other kinds of damage to the cord that appear structural or compressive in nature may unfold over a much longer time horizon—inconsistent with the more acute, monophasic nature of progressive neuroinflammation. M. Reitz et al., *Intramedullary Spinal Cavernoma: Clinical Presentation, Microsurgical Approach, and Long-Term Outcome in a Cohort of 48 Patients*, 39 Neurosurgical Focus 1, 3 (2015), filed as Ex. A Tab 3 (ECF No. 28-4) ("[t]he time span from onset of symptoms to the diagnosis of [intramedullary spinal cavernoma] varied between hours in cases of acute and severe neurological impairment, and 96 months in cases of mild neurological impairment …").

The 4 hours to 21-day timeframe for progression to symptoms nadir was fashioned with these etiologic distinctions in mind. Working Group Criteria at 501. The authors of the Working Group Criteria allowed for a certain degree of arbitrariness to the defined period—meaning if applied rigidly, the timeframe could exclude acute TM cases (which were more likely to be

---

and poliomyelitis); another group is defined by whether there is coexistent disease of the meninges (meningomyelitis) or the brain (encephalomyelitis). In practice, the term is also used to denote noninflammatory lesions of the spinal cord. 2. Inflammation of the bone marrow." *Myelitis*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=32680&searchterm=myelitis (last visited Aug. 17, 2026).

immune-mediated). *Id.* Yet the authors also noted that the timeframe might mistakenly *include* cases of TM not attributable to a "truly inflammatory disorder" (such as a paraneoplastic, or tumor-caused, myelopathy where imaging enhancement could mistakenly suggest the presence of inflammation, when in fact enhancement was attributable to blood-brain barrier penetration attributable to the tumor). Thus, "some vascular myelopathies will still undoubtedly fall within the current ATM criteria, whereas some patients who may have inflammatory 'true' ATM may be excluded based solely on their rapid progression of symptoms"—but nevertheless the authors remained "committed to distinguishing ATM from a rapidly evolving vascular myelopathy ( 4-hour progression), a slowly progressive or stuttering hereditary myelopathy, spinal cord tumor, myelopathy due to a dural arteriovenous fistulas, and a chronic progressive form of MS (all longer than 21 days of progression)." *Id.*

MRI findings usually help treaters confirm the existence of TM (although as this case demonstrates, it can be very difficult to interpret what imaging actually "shows," with reasonable and qualified medical experts disagreeing on what the findings reveal). But one important factor that should be stressed herein is that the *cause of symptoms in TM is inflammation in the spinal cord*—and it is *that inflammation* that "shows up" on imaging, usually as lesions. R. Bakshi & J. Mazziotta, *Acute Transverse Myelitis After Influenza Vaccination: Magnetic Resonance Imaging Findings*, 6 J. of Neuroimaging 248 (1996), filed as Ex. 23 (ECF No. 26-9). Another significant feature of TM is how it can be independently corroborated. In addition to imaging, CSF testing is important, since it can reveal indicia of inflammation in the cord, such as pleocytosis or other findings. Working Group Criteria at 500 Table 1.

Importantly, and as Program decisions recognize, vaccine-associated TM typically presents *acutely*. *See, e.g.*, *Handjis v. Sec'y of Health & Hum. Servs.*, No. 18-1044V, 2022 WL 17852426, at *16 (Fed. Cl. Spec. Mstr. Dec. 5, 2022) ("[i]f one were to accept that petitioner received a high dose flu vaccine on December 10, 2015, and presented on December 14, 2025 with symptoms that were ultimately diagnosed as TM and supported by objective testing, then petitioner would have satisfied [*Althen*] Prong III"); *Raymo v. Sec'y of health & Hum. Servs.*, 11-0654V, 2014 WL 1092274, at *10, *19 (Fed. Cl. Spec. Mstr. Feb. 24, 2014) (finding onset of TM occurred between three to four days after vaccination and was consistent for an immune-mediated disorder). This is consistent with a vaccine-induced immune reaction, which should begin not long after vaccination and unfold quickly thereafter. Although myelitis can sometimes take longer to progress, the cause of injury becomes less likely inflammatory in nature if disease course progression exceeds that three-week period. Working Group Criteria at 501.

The Program has had varied responses to TM when alleged to be a vaccine-associated adverse event. Petitioners have succeeded in claims that different covered vaccines can cause TM. *See, e.g.*, *Le v. Sec'y of Health & Hum. Servs.*, No. 16-1078, 2023 WL 3049203, at *23 (Fed. Cl. Spec. Mstr. Mar. 30, 2023) (finding petitioner provided preponderant evidence that the Tdap vaccine can cause TM via molecular mimicry); *Schmidt v. Sec'y of Health & Hum. Servs.*, No. 07-20V, 2009 WL 5196169 (Fed. Cl. Spec. Mstr. Dec. 17, 2009) (granting entitlement on a claim that

an influenza vaccine caused petitioner's TM via molecular mimicry). However, as with any case, the specific factors of an individual vaccinee's medical history can impact a claim's success, even when the causal theory finds favor. *See, e.g.*, *Palattao v. Sec'y of Health & Hum. Servs.*, No. 13-591V, 2019 WL 989380 (Fed. Cl. Spec. Mstr. Feb. 4, 2019) (denying entitlement in TM case where petitioners failed to establish that the timing of onset of symptoms was medically appropriate under their proposed causation theory).

My own decisions demonstrate more of a willingness to accept that some vaccines can be causal of TM than others. *Compare J.S. v. Sec'y of Health & Hum. Servs.*, No. 14-851V, 2018 WL 11731139 (Fed. Cl. Spec. Mstr. Apr. 9, 2019) (finding flu vaccine to be causal of TM) *with Curry c. Sec'y of Health & Hum. Servs.*, No. 22-729V, 2025 WL 1693655 (Fed. Cl. Spec. Mstr. Apr. 28, 2025) (denying entitlement where petitioner alleged Tdap vaccine caused him to suffer TM). Resolution of the matter has sometimes turned on the second or third *Althen* prongs—whether the totality of the evidence suggests the vaccine likely did cause a person's TM, and/or whether it began in a medically-acceptable timeframe, measured from the date of vaccination. *See Lloyd v. Sec'y of Health & Hum. Servs.*, No. 21-1332V, 2025 WL 3002617 (Fed. Cl. Spec. Mstr. Sept. 29, 2025); *Ross v. Sec'y of Health & hum. Servs.*, No. 22-136V, 2025 WL 3531576 (Fed. Cl. Spec. Mstr. Nov. 14, 2025).

Other cases turn on the likely nature of injury. A proposed TM diagnosis must be substantiated when a claimant's theory depends on a vaccine causing some form of inflammatory myelitis. *Henningsen*, 2026 WL 164973, at *45 (TM diagnosis not substantiated); *I.J. v. Sec'y of Health & Hum. Servs.*, No. 16-864V, 2021 WL 1232733 (Fed. Cl. Spec. Mstr. Jan. 4, 2021) (TM established as likely injury), *mot. for review granted on other grounds*, 155 Fed. Cl. 20 (2021). TM is not automatically the correct diagnosis simply because the spinal cord is involved—and even where the clinical/testing evidence is somewhat inconclusive. The very existence of ambiguity in interpretation of imaging results underscores the possibility that clinical symptoms attributable to a spinal cord injury are not automatically *likely* to reflect TM. And as is true in any Program case, in instances where diagnosis is disputed, the evidence in its totality must be considered carefully.

## II. Petitioner Did Not Likely Experience Acute/Inflammatory TM

As a threshold matter, a petitioner must establish he suffers from the condition for which he seeks compensation. *Broekelschen*, 618 F.3d at 1346. "The function of a special master is not to 'diagnose' vaccine-related injuries, but instead to determine 'based on the record as a whole and the totality of the case, whether it has been shown by a preponderance of the evidence that a vaccine caused the [petitioner's] injury.'" *Andreu*, 569 F.3d at 1382 (quoting *Knudsen*, 35 F.3d at 549). However, "[a]lthough the Vaccine Act does not require absolute precision, it does require the petitioner to establish an injury . . ." *Stillwell v. Sec'y of Health & Hum. Servs.*, 118 Fed. Cl. 47, 56 (2014) (quoting Section 11(c)). Accordingly, the Federal Circuit has concluded that it is "appropriate for the special master to first determine what injury, if any, [is] supported by the

evidence presented in the record" before applying a causation analysis pursuant to *Althen*, 418 F.3d at 1274. *Lombardi v. Sec'y of Health & Hum. Servs.*, 656 F.3d at 1343, 1351–53 (Fed. Cir. 2011). Determining whether an alleged diagnosis has sufficient record support can result in a denial of entitlement—even without getting into analysis of the *Althen* prongs.

The overall medical record evidence in this case preponderates *against* a finding that Petitioner likely experienced the kind of TM at issue in a vaccine injury case: a neuroinflammatory myelitis propagated by an immune mechanism. I reach this conclusion despite the fact that I cannot identify what diagnosis the record *does* support. But a special master's determination of a claimant's success in substantiating the injury alleged does not require determining what injury the record *does* support. *See Knudsen*, 35 F.3d at 549 (stating "[t]he special masters are not 'diagnosing' vaccine-related injuries."). Even if in this case I cannot determine what etiology best explains Petitioner's symptoms, the record in this case does not favor acute TM of the kind mediated by an immune process leading to inflammation.

In reaching this conclusion, I am guided by the Working Group Criteria, which have been shown to provide a reliable diagnostic framework for evaluation of the *kind* of TM that would—or would not—be primarily attributable to an immune-mediated, inflammatory process.[18] Although Dr. Tornatore correctly noted that one purpose of the Working Group Criteria was to create parameters for TM's treatment in studies (so that there is consistency from one study to another in the kinds of patients deemed to have TM, when those individuals are included in a patient sample), Dr. Roos in response persuasively established that the Criteria have considerable diagnostic value nevertheless. Tr. at 225, 273; Working Group Criteria at 499 (proposed diagnostic criteria "will ensure a common language of classification, reduce diagnostic confusion, and lay the groundwork necessary for multicenter clinical trial. In addition, a framework is suggested for evaluation of individuals presenting with signs and symptoms of [acute]TM"). And it may be true, as Dr. Tornatore emphasized, that *not all* TM cases will meet these criteria in a chapter and verse sense, but this does not mean that the Criteria's general views do not describe what is *most likely*. Since the Program deals not in mere plausible possibilities but "more likely than not" preponderant showings, such criteria highly are relevant in weighing the likelihood of TM as the proposed injury in this case.

Here, a diagnosis of an inflammatory-mediated form of TM would need evidence of, among other things, a lack of extra-axial compressive etiology by neuroimaging; demonstrated inflammation within the spinal cord via CSF pleocytosis; IgG index, or evidence of gadolinium

[18] Of note, the literal "Working Group" consisted of thirty prominent experts in the fields of neurology, epidemiology, neuroimmunology, and related fields who proposed the diagnostic criteria for idiopathic acute TM in 2002. Working Group Criteria at 502, 505. Included in this group of accomplished medical and scientific experts was Dr. Roos—as well as several other authors of whose publications have not only been used in the Vaccine Program in general, but in the case at hand. *See, e.g.*, D. Kerr & H. Ayetey, *Immunopathogenesis of Acute Transverse Myelitis*, 15 Current Opinion in Neurology 339 (2002), filed as Ex. 17 (ECF No. 26-3); C. Krishnan et al., *Transverse Myelitis: Pathogenesis, Diagnosis and Treatment*, 9 Frontiers in Bioscience 1483 (2004), filed as Ex. 18 (ECF No. 26-4); Working Group Criteria at 502, 505.

enhancement; and a disease progression to nadir between four hours and twenty-one days following the onset of symptoms. Working Group Criteria at 500 Table 1. These criteria are insufficiently met.

First, Dr. Roos persuasively established that Petitioner's overall clinical presentation (over the time of alleged earliest onset to mid-December 2021) was inconsistent with TM. While Petitioner's urologic concerns from early September 2021 might have been urgent (and of a magnitude different from his prior treatment for BPH), they are equally consistent with that preexisting condition, as opposed to something wholly distinguishable from his prior treatment. Dr. Roos also noted the issues that prompted these treatment visits could be attributable to medication issues. And Petitioner's PCP felt as of mid-November that Petitioner's complaints sounded more in the category of a peripheral neuropathy. Ex. 2 at 351, 360, 404, 406.[19] Petitioner's condition was never viewed to be acute or downwardly progressive between early September and early December.

Second, and even more compelling, the medical records establish that Petitioner's extended clinical course was inconsistent with acute TM, in that the alleged injury was not progressive in the expected timeframe. As Dr. Roos explained at hearing, "[TM] is a progressive inflammatory myelopathy" which means "symptoms start and they progress." Tr. at 210. Dr. Tornatore alleges an onset of Petitioner's TM beginning on September 9, 2021, but the records indicate that Petitioner did not report any additional neurologic symptoms until around October 15, 2021, which does "not happen[] in the course of [TM]", according to Dr. Roos. *See* Ex. 2 at 404 (documenting November 2021 visit with Petitioner's PCP and noting "a progression of significant numbness, tingling and pain in both legs, particularly the right leg" that is "progressively worse over the last 2–6 weeks"). Moreover, treater notes from Drs. Kumar and Beck in December 2021 document Petitioner's symptoms as even more "progressive." *See* Ex. 2 at 367–68, 375, 395; Ex. 8 at 4–9, 12, 14, 17, 23. Thus, Petitioner argues he experienced a meandering and slowly-progressive version of TM - inconsistent with how autoimmune-mediated inflammatory TM would be expected to present.

Petitioner contends that the timeframe embraced by the Working Group Criteria should not be rigidly applied. But this does not mean that they do not generally describe what would be seen for this version of TM. Other literature filed in this matter also corroborated Dr. Roos's view that the four hour to 21-day timeframe well-captures the progression timeframe for the relevant form of TM, as is alleged to have occurred here. *See, e.g.*, C. Prado, *Clinical Approach to Myelopathy*

[19] I give far less weight to the absence of evidence of motor concerns. Dr. Roos proposed that generally TM would involve lower extremity weakness, but this has less-definitively been shown to be a singular criteria for an immune-mediated form of myelitis, as opposed to something that *can* be seen with it, along with the kind of sensory complaints Petitioner reported had begun in mid-October. *See, e.g.*, Working Group Criteria at 500 Table 1. At the same time, however, Dr. Tornatore was unpersuasive in his effort to flip this lack of evidence on its head (by contending that a vascular spinal cord injury *would* always involve motor symptoms).

*Diagnosis*, 30 Spinal Cord Disorders 14, 19 (2024), filed as Ex. A Tab 2 (ECF No. 28-3) ("Prado"). Prado describes a strategy for evaluating individuals with suspected myelopathy, and provides advice on a diagnostic approach. In so doing, it classified the temporal profile of symptom presentation into five different categories: "hyperacute (≤ 6 hours from onset to nadir), acute (6 to 48 hours), subacute (2 to 21 days), chronic evolving (> 21 days), or relapsing-remitting [ ]." By this construction, Petitioner's course was most consistent with a chronic evolving myelopathy, as his symptoms progressed well beyond the generally accepted 21-day timeframe described in the medical literature. *See, e.g.*, Prado at 19; Working Group Criteria at 3; *see also* D. Kerr & H. Ayetey, *Immunopathogenesis of Acute Transverse Myelitis*, 15 Current Opinion in Neurology 339, 340 Table 1 (2002), filed as Ex. 17 (ECF No. 26-3); C. Krishnan, et al., *Transverse Myelitis: Pathogenesis, Diagnosis and Treatment*, 9 Frontiers in Bioscience 1483 (2004), filed as Ex. 18 (ECF No. 26-4).

Also highly relevant to my determination on the preponderant strength of the TM diagnosis in this case is the issue of most likely onset. As noted, I do not find that Petitioner's onset likely occurred in early September 2021,[20] when he reported urologic symptoms. I cannot conclude on the record that these were new symptoms, with no relation to Petitioner's prior treatment. Rather, it is evident from the record that Petitioner was by this time receiving treatment for BPH and urologic concerns well before, and he linked those issues to what he reported in September. He even obtained more related treatment that October for the same concerns, without any particular evidence of a progressing or worsening condition. While it is the case that spinal cord injuries can present with neurogenic bladder issues, this record does not support that having occurred here, given Petitioner's history.

A secondary problem with a September onset is that if in fact Petitioner's spinal cord injuries *did* begin at this time, Petitioner's progression (as noted above) remains inconsistent with what would be expected for a person experiencing a neuroinflammatory-caused spinal cord issue. Why was it that almost five weeks passed from the early urologic symptoms closer-in-time to vaccination and the mid-October foot sensations Petitioner has reported? This progression does not fit with what would be expected for an inflammatory myelitis at all, and it cannot be waived away by Dr. Tornatore with the statement that "sometimes" this happens in TM.

Petitioner fares no better if his onset occurred in mid-October, with Petitioner's more obvious neurologic symptoms. Those symptoms are stronger evidecne of a spinal cord condition, and I do find on this record that they are related to the December 2021 findings that lead to Petitioner's TM diagnosis. But Petitioner's clinical course shows he experienced these symptoms

[20] I also do not find, however, that onset was likely prior to vaccination—specifically, at the time of Petitioner's kayak-associated back pain. It is certainly plausible that this experience was connected to degenerative concerns, consistent with what was later seen on MRI in December—but the record preponderates more in favor of the determination that this was an incidental and transient occurrence that cannot be connected to Petitioner's various post-vaccination symptoms.

without significant progression thereafter. Moreover, Petitioner's primary care physician interpreted his condition in November to be possibly evidence of a peripheral neuropathy. This course is inconsistent with the more rapid progression to nadir that would be associated with an inflammatory myelopathy. If Petitioner's acute, immune-mediated form of TM had begun only in mid-October, it should have significantly worsened *much* sooner than it did.

Another evidentiary obstacle in this case is the various degenerative findings derived from the December 2021 imaging. Ex. 2. at 379, 398; Ex. 7 at 8–12, 19. I am unable to embrace Dr. Roos's contention that this was the clear, or even more likely, explanation for Petitioner's symptoms. I also do not give weight to the argument that Petitioner's pre-vaccination kayak injury in July 2021 was related to the findings of disc compression; the record is too opaque on the significance of this event (especially since it did not prompt subsequent treatment, or progress to more concerning symptoms within weeks thereafter). But I can determine that this evidence of compressive/structural issues weakens further the conclusion that Petitioner experienced the kind of TM that could be deemed immune-mediated.

In reaching this assessment, I give greater weight to the testimony of Dr. Roos over Dr. Tornatore. Of note, Dr. Roos was an invited member *and* author of the Working Group Criteria article. Tr. at 206. She explained that the Working Group's goal was to establish more uniform diagnostic criteria to aid clinicians in practice, as well as for clinical studies in general. *Id.* at 225. Her personal experience, and insight into the process by which she and her co-authors used in creating the proposed diagnostic criteria (i.e., their clinical experience in evaluating and treating individuals with myelopathy) is worthy of significant weight. And she credibly explained why the under-21 days timeframe was *in most cases* consistent with an acute, neuroinflammatory form of TM.

Dr. Tornatore, by contrast, unpersuasively defended the Petitioner's course as consistent with an immune-mediated kind of TM. In attempting to do so, he consistently struggled to downplay unsupportive record with blanket contentions that *sometimes* TM does not feature weakness, progresses over a timeframe of more than three weeks, involves both evidence of lesions and compressive spinal cord damage; etc. Tr. at 131. But it proves too little for an expert to define an injury as a *rare* version of a particular disease that in *rare* cases is vaccine-caused, and then invoke rarity against all counter-arguments that the facts are not *likely* supportive of the alleged injury—consistent with the preponderant showing that a claimant must in Vaccine Program cases meet. *This* has not been shown to be a case where the facts support the conclusion that Petitioner's course and presenting symptoms are consistent with an acute form of TM.

Admittedly, Petitioner can point to a number of medical records (particularly after December 2021) in which treaters embrace a TM diagnosis (and at times even deem it vaccine-associated). But I am not bound by contemporaneous treater determinations on diagnosis. *Synder ex rel. Snyder*, 88 Fed. Cl. at 745 n. 67 (citing *Andreu ex rel. Andreu*, 569 F.3d at 1375) (stating that "there is nothing … that mandates that the testimony of a treating physicians is sacrosanct—

that it must be accepted in its entirety and cannot be rebutted."). And in this case, there are several persuasive bases for not giving those views much weight.

In particular, it is not clear from the work-ups Petitioner received from mid-December to thereafter that the true nature of his overall course was fully evaluated when treaters began to accept the TM diagnosis. While the analysis in my evidentiary weighing involved a more granular breakdown of Petitioner's history, informed by qualified neurologic experts with demonstrated knowledge of the factors relevant to a TM diagnosis, the contemporaneous treaters Petitioner encountered were relying on more cursory assessments rooted in not only immediate test results but what Petitioner *told them* had happened. Ex. 2 at 405; Ex. 9 at 54. In addition, Dr. Roos convincingly explained that there is a problem in medical diagnosing with "anchoring," in which an element in a differential diagnosis gets repeated over and over, eventually to be favored but without any subsequent review of the medical records in their totality. Tr. at 269, 308–10. This case stands as an example of that kind of anchoring, as well as the overbroad character of the TM diagnosis, with many kinds of myelopathies improperly squeezed into the diagnosis regardless of etiology. *See generally* Blackburn & Greenberg. TM (as the Program has understood it—an acute, inflammatory and immune-mediated injury, when alleged to be vaccine-caused) has not been established as the proper diagnosis.

My finding in this case does not substitute my own judgment for contemporaneous treaters, and I make no effort to propose a medical diagnosis I am unqualified to opine upon. But the legal analysis I apply (which deals in standards specific to the Vaccine Program and evidentiary burdens like preponderance) involves a balancing of evidence in its totality, for the *legal* purpose of assessing whether entitlement to damages has been established. That evidence ultimately does not lean toward a spinal cord, neuroinflammatory myelitis being the most likely proper diagnosis (even though I cannot say *what* the proper diagnosis should be).

In many Vaccine Act cases, no etiology associated with a vaccine-induced disease can be distinguished from other causes. But here, vaccination *can* be shown to be associated with a specific version of TM, with its own clinical and testing characteristics and elements. Working Group Criteria at 500 ("ATM represents a subset of acute myelopathies"). Those criteria are not preponderantly satisfied.

## III. The *Althen* Causation Test Cannot be Met

The failure to establish even one of the three *Althen* prongs in the context of a causation-in-fact claims is a sufficient basis for a claim's dismissal (and therefore the three prongs need not be all addressed in cases where a claimant clearly fails at least one). *Dobrydnev v. Sec'y of Health & Hum. Servs.*, 566 Fed. Appx. 976, 980 (Fed. Cir. 201). Although Petitioner has not preponderantly established he likely experienced a form of TM that *could* be vaccine-caused, I also note that the second and third *Althen* prongs would not be met on the present record, even if I had accepted acute, immune-mediated neuroinflammatory TM as the proper diagnosis.

First, and consistent with my discussion above, I cannot find that the third prong—which requires establishing a "medically acceptable" timeframe for onset of an alleged vaccine-caused injury to have occurred—has been preponderantly established. Assuming the flu vaccine is capable of causing a neuroinflammatory form of TM (and there is reliable evidence supporting that proposition), the timeframe at issue - vaccination in late August, with first likely neurologic symptoms in mid-October (thus more than six weeks post-vaccination), and then evidence of inflammatory lesions seen only in December (three months post-onset), but without sufficient progression—has not been demonstrated to be medically acceptable. Not only is the timeframe inconsistent with TM's likely more acute progression (when due to inflammation), but it is too lengthy to be likely vaccine-associated. *See Bender v. Sec'y of Health & Hum. Servs.*, No. 11-693V, 2017 WL 5381628 (Fed. Cl. Spec. Mstr. Oct. 6, 2017), *mot. for review granted, decision vacated, and remanded*, 138 Fed. Cl. 197 (2018), *decision after remand*, 2018 WL 3679637, at *32 (Fed. Cl. Spec. Mstr. July 2, 2018), *second mot. for review den'd and decision sustained*, 141 Fed. Cl. 262 (2019).

This determination is similarly defensible even if Petitioner's proposed onset in September 2021 is accepted.[21] The time that elapsed from vaccination to early September is shorter, and not facially unreasonable—consistent with other cases involving alleged autoimmune responses triggered by a vaccine. But the subsequent course he experienced is not only inconsistent with TM (as noted above), but cannot be squared with an autoimmune process that could rapidly cause appearance of clinical symptoms impacting urologic health, but which would then meander for weeks to months later. Other than Dr. Tornatore's insistence that "sometimes" TM progresses this way, insufficient evidence has been offered to show that an acute kind of TM would have a shorter, post-infectious (or vaccinated) onset but would then not progress quickly. And it has not been shown the autoantibodies presumably created by the vaccination in August would continue to be upregulated afterward but would cause less-sudden symptoms, with limited downward progression.

Arguably, the best evidence in this case corroborating the presence of an inflammatory myelitis was obtained in mid-December 2021, when imaging revealed enhancing (and hence recent) lesions on Petitioner's spinal cord. Ex. 7 at 12. But how, then, would a vaccine received more than *three* months before explain that active lesion only then? And after weeks of plateaued symptoms? Such a timeframe would be even more medically-*un*acceptable than one of six or seven weeks. *Goodwin v. Sec'y of Health & Hum. Servs.*, No. 16-1676V, 2023 WL 7924657, at *30 (Fed. Cl. Spec. Mstr. Oct. 23, 2023) (concluding that an interval of 41 days from onset to nadir was not consistent with acute TM); *Murray v. Sec'y of Health & Hum. Servs.*, No. 19-1976, 2022 WL

[21] (It is unquestionably true in some cases that a claimant's TM could present with neurogenic bladder issues akin to what Petitioner reported. *See Curry v. Sec'y of Health & Hum. Servs.*, No. 22-729V, 2025 WL 1693655, at *18 (Fed. Cl. Spec. Mstr. Apr. 28, 2025). Although here I do not find on this record that Petitioner's onset *did* likely begin at this time, and/or relate to his more obvious mid-October symptoms, I will assume for sake of argument his onset is as he alleges.

17853378, at *9 (Fed. Cl. Spec. Mstr. Nov. 30, 2022) (finding a six month plus progression of neurologic problems from onset to nadir is not consistent with TM).

Second, the record does not substantiate the conclusion that Petitioner's TM *was* likely caused by the two vaccines he received, and thus the second, "did cause" prong is unmet. Petitioner can point to treater evaluations favoring a causal association—but they occurred much later (specifically, after his mid-December treatment, and hence more than three months post-vaccination), and do not seem to have assessed his overall progression in the post-vaccination timeframe (or relied on Petitioner's self-reporting about when symptoms appeared and how they related). At the same time, I again emphasize Petitioner's progression, which is wholly-inconsistent with the kind of acute, immune-mediated version of TM that has in prior cases been deemed vaccine-caused. If the vaccines Petitioner had received on August 29, 2021 had initiated an aberrant immune response causing urologic issues, then there should have been evidence of progression of symptoms afterward consistent with immune-mediated inflammation of the affected portions of the spinal cord. Even if that progression could take longer than three weeks, it has not been preponderantly explained how this process would take five to six weeks to evolve from neurogenic bladder issues to sensory symptoms in Petitioner's feet and legs, and then "stall" but persist over another four to six weeks. This is not likely the course of immune-mediated, acute TM that was triggered by vaccination.

## CONCLUSION

Vaccine Act claimants must carry their burden of proof to be entitled to damages. Petitioner has not shown by preponderant evidence that he had TM, or that it began in a medically acceptable timeframe. He therefore is not entitled to damages.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[22]

**IT IS SO ORDERED**.

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

[22] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.